**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| TRICIDA, INC., | Case No. 23-10024 (CTG) |
| Debtor. | |
| JACKSON SQUARE ADVISORS, LLC, in its capacity as the Liquidating Trustee of the Tricida Liquidating Trust, | Adv. Proc. No. 25-52431 (CTG) |
| | **Related Docket Nos. 24, 28, 63** |
| Plaintiff, | |
| v. | |
| DAVID BONITA, *et al.*, | |
| Defendants. | |

**AMENDED MEMORANDUM OPINION**

The debtor developed a drug that it hoped would be effective in treating kidney disease. The drug, however, failed clinical trials and did not receive FDA approval. Left without a viable business but holding very substantial net operating losses – tax attributes that could potentially have had material value – the debtor began a process of exploring a sale, including one that, it is argued, might have monetized the company's tax attributes. The efforts to locate a buyer outside of bankruptcy, however, were unsuccessful and the debtor ultimately filed this chapter 11 case.

The trustee filed this adversary proceeding alleging that the company lost the value of its tax attributes, before bankruptcy, through a complex set of self-dealing

transactions.[1]  The allegation is that OrbiMed, the company's largest shareholder, desperately wanted to sell its shares after the failed clinical trials.  OrbiMed was apparently concerned, however, that having appointed two directors to the company's board, it would have securities law exposure if it sold during a time when the company did not permit its own insiders to trade the company's shares.

Federal securities laws, of course, prohibit the trading of securities on inside information.[2]  To facilitate compliance with the securities laws, companies create "trading windows" for insiders who are likely to have material nonpublic information. A company's "trading window" is a scheduled time when employees and executives are allowed to trade the company's stock.  Outside that window, the company prohibits insiders from trading so that they do not trade while (perhaps inadvertently) holding important confidential information, like unreleased earnings or news of some other significant event that would affect the value of the company's shares.  Such windows typically open after the company has publicly announced its results or other key information, thereby leveling the playing field for all investors.

---

[1] The plaintiff in this action, Jackson Square Advisors in its capacity as the liquidating trustee of the Tricida Liquidating Trust, is referred to as the "trustee."  The defendants are Klaus Veitinger and David Bonita (both of whom were directors appointed by OrbiMed Advisors, LLC, the company's largest shareholder, which is referred to as "OrbiMed"), Robert Alpern (a director who was not appointed by OrbiMed), Robert McKague, Geoffrey Parker, and Gerrit Klaerner (all officers of the company who allegedly participated in the decision to open the trading window, and who were alleged to have received retention bonuses), and Dawn Otto (formerly Parsell) (an officer who is not alleged to have participated in the decision to open the trading window, but who is alleged to have received a retention bonus).

[2] *See generally* 15 U.S.C. § 78j(b) (Section 10(b) of the Securities Exchange Act of 1934); 17 C.F.R. § 240.10b-5 (Rule 10b-5); *Chiarella v. United States*, 445 U.S. 222 (1980).

The trustee's theory is that the directors (Bonita, Veitinger, and Alpern, the first two of whom were appointed by OrbiMed), approved retention bonuses for the officers who made the decision whether to open the trading window (McKague, Parker, and Klaerner). In exchange for those bonuses, it is alleged that the Officers in fact opened the trading window. OrbiMed then sold its shares, which amounted to a change in ownership that under the tax laws destroyed the company's net operating losses.

But despite the complaint's intonation of a conspiracy, the complaint does not allege that the company had a duty to make decisions about opening or closing the trading window with an eye towards preserving the value of its net operating losses. Instead, the trustee's argument is that the company's insiders in fact had access to material nonpublic information at the time the officers decided to open the trading window, and that opening the window while insiders had material nonpublic information breached the fiduciary duty by permitting what was, in substance, improper insider trading. As the trustee puts it, the directors and officers "broke their promised fidelity to Tricida and breached their fiduciary duties by decimating the value of Tricida's [net operating losses], paying themselves millions of dollars in bonuses, and trading on insider (non-public) information."[3]

The defendants moved to dismiss the complaint under Rule 12(b)(6), asserting that it failed to state a claim. The Court will grant the motion without prejudice to the trustee's right to seek leave to amend (or the defendants' right to oppose it). The

---

[3] D.I. 1 ¶ 4.

core problem with the trustee's various claims is that he acknowledges that the Court can take judicial notice of the fact that the decision to open the trading window was made promptly after the company made a public disclosure, in an 8-K filing with the SEC, of the fact that the company had begun exploring strategic alternatives. That 8-K, however, is not mentioned in the complaint. Without addressing the substance of those disclosures, the complaint does not plausibly allege that the company in fact opened the trading window while its insiders were still in possession of material inside information.

That failure is fatal to the complaint's core allegation of improper manipulation of that trading window for the benefit of OrbiMed. The complaint's basic claim for breach of fiduciary duty against the directors and officers fails for that reason. The claim that the officers breached the duty of care when they opened the trading window fails because there is no allegation that the company had material nonpublic information at the time the officers voted to open the trading window. The *Brophy* claim, one for trading on material nonpublic information, likewise fails for the same reason. The claim of corporate waste fails to meet the very high bar applicable to such claims because the trustee acknowledges that the decision to pay retention bonuses to retain the company's senior leadership as the company encountered financial distress is customary in such circumstances. And in the absence of any affirmative claim of breach, the aiding and abetting claim also fails.

### Factual and Procedural Background

After years of development and operating losses, Tricida learned in October 2022 that its drug to treat kidney disease had failed clinical trials and would not

4

receive FDA approval.[4]  The company filed a Form 8-K to disclose the failure to the public.[5]  At this time, the company had accumulated a significant amount, $740 million, of net operating losses.[6]  Without a viable business, but with the potentially valuable net operating losses, the company initiated a strategic alternatives process in an attempt to monetize the value held in those tax attributes.[7]  The fact that the company had begun a strategic alternatives process to maximize value was disclosed in early November 2022.[8]  Throughout this time, the company's trading window for insiders remained closed, as it had since 2020, due to the fact that insiders possessed material nonpublic information concerning the development and subsequent failure of the kidney disease drug.[9]

Seeking to maintain the status quo and retain key employees through the strategic alternatives process, on November 15, 2022 the company's board approved retention payments to key officers.[10]  All of the officers, including Parsell, received payments under the retention plan.[11]  The board that approved the retention payments was made up of six directors, including the three who are named as

---

[4] *Id.* ¶ 3.  The facts set forth herein are based on the allegations made in the complaint, which for purposes of this motion to dismiss are taken as true.

[5] *Id.* ¶ 43.

[6] *Id.* ¶ 40.

[7] *Id.* ¶ 43.

[8] *Id.* ¶ 44.

[9] D.I. 1 ¶ 58.

[10] *Id.* ¶ 52.

[11] *Id.*

defendants.[12] Two of the directors, Veitinger and Bonita, had been appointed by OrbiMed, an original equity holder of the company.[13] On the same day that the retention payments were approved by the board, the officers determined that the company's trading window for insiders would remain closed.[14] The officers made this decision with the guidance of outside counsel, who advised that the window should remain closed for directors or officers who possessed material nonpublic information.[15] Outside counsel provided no advice, however, about whether any director or officer possessed such information.[16]

On November 17, 2022, the company filed an additional 8-K.[17] After this additional disclosure of material information to shareholders, at the next board meeting, on November 21, 2022, the officers determined that the trading window would open.[18] During the time between the failing of the kidney disease drug and the opening of the trading window, OrbiMed inquired about the status of the trading window.[19] Shortly after the trading window opened, OrbiMed liquidated its holdings

---

[12] *Id.* ¶ 54.

[13] *Id.* ¶ 31.

[14] *Id.* ¶ 48.

[15] D.I. 1 ¶ 48.

[16] *Id.* ¶ 62.

[17] *See* D.I. 26-4. While the fact of this 8-K filing is not alleged in the complaint, the parties do not dispute that it may properly be considered on a motion to dismiss for the fact of the filing (as opposed to the truth of the statements contained therein). *See infra* n.45 and accompanying text.

[18] D.I. 1 ¶ 61.

[19] *Id.* ¶ 60.

of the debtor's stock, as did Alpern.[20]  It thereafter became clear that a change of control event had occurred, and the value of the debtor's net operating losses decreased substantially.[21]

The trustee alleges that the directors' decision to approve the bonuses and the officers' decision to open the trading window was motivated not by what was best for the debtor, but by self-interest.  The trustee thus brings claims for breach of fiduciary duty against all of the defendants, as well as a claim for corporate waste against the three director defendants who allegedly approved the retention bonuses, unjust enrichment claims against the officer defendants who allegedly received retention bonuses, and aiding and abetting against OrbiMed.  The various defendants have moved to dismiss all of the claims under Rule 12(b)(6) for failure to state a claim.

## Jurisdiction

This Court has jurisdiction over this adversary proceeding as one "related to" the bankruptcy case under 28 U.S.C. § 1334(b).  To be sure, the fact that the claim is a state-law claim being asserted by a post-confirmation trust raises questions of subject-matter jurisdiction under the Third Circuit's decision in *Resorts International*.[22]  The confirmed plan in this case, however, specifically identified this claim as one over which the Court would retain jurisdiction.  The Court is satisfied

---

[20] *Id.* ¶¶ 70, 76.

[21] *Id.* ¶ 79.

[22] *See In re Resorts Int'l, Inc.*, 372 F.3d 154, 166-169 (3d Cir. 2004); *In re Structurlam Mass Timber U.S. Inc.*, No. 23-10497, 2025 WL 3037162, at *6-10 (Bankr. D. Del. Oct. 30, 2025).

that, in the circumstances of this case, this specific retention of jurisdiction provision is sufficient to permit the Court to exercise subject-matter jurisdiction.

## Analysis

In ruling on a motion to dismiss, the court must determine that the complaint's factual allegations sufficiently state the asserted claims.  Under Rule 8(a) of the Federal Rules of Civil Procedure, a complaint must include a "short and plain statement" showing the plaintiff is entitled to relief.[23]  Generally, courts only consider what is written inside the four corners of a complaint on a motion to dismiss brought under Rule 12(b)(6).[24]  To survive a motion to dismiss brought under Rule 12(b)(6), a complaint must "contain plausible facts which state a claim."[25]  The Third Circuit has established a two-part analysis for the evaluation of a motion to dismiss.[26]  *First*, the court should separate the factual and legal elements of a claim and accept all well-pleaded facts as true while disregarding any legal conclusions.[27]  *Second*, the court must determine whether the facts alleged are sufficient to show a plaintiff has a plausible claim for relief.[28]

---

[23] Fed. R. Civ. P. 8(a)(2) (made applicable by Fed. R. Bankr. P. 7008).

[24] *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

[25] *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009).

[26] *Fowler*, 578 F.3d at 210-211.

[27] *Id.*

[28] *Id.*

8

**I.    The trustee's claims for breach of the duty of loyalty against the directors and officers will be dismissed for failure to state a claim.**

The duty of loyalty requires that the fiduciaries place the interests of the corporation above their own interests.[29]  To show a breach of the duty of loyalty, a plaintiff must prove either that (1) the defendants were conflicted and pursued their own interests above those of the company or (2) the defendant failed to pursue the best interests of the company in good faith.[30]  The requirement to act in good faith is thus a "subsidiary element" of the duty of loyalty.[31]

The trustee contends that the directors breached their duty of loyalty by approving the retention payments "in exchange for" the officers opening the trading window.[32]  Similarly, the trustee asserts that the officers violated their duty of loyalty by accepting the payments and opening the trading window "in exchange for" the directors approving the payments.[33]  The trustee argues that each of these actions was taken in circumstances in which "the respective defendant stood to benefit from a transaction that wasn't fair to Tricida (because Tricida received no benefit, and in fact was damaged), and each respective defendant acted for purposes other than advancing Tricida's best interests and/or intentionally failed to act in the face of a

---

[29] *See In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 750-751 (Del. Ch. 2005).

[30] *In re Orchard Enterprises, Inc. Stockholder Litig.*, 88 A.3d 1, 32-33 (Del. Ch. 2014) ("A plaintiff can call into question a director's loyalty by showing that the director was interested in the transaction under consideration or not independent of someone who was.  Or a plaintiff can demonstrate that the director failed to pursue the best interests of the corporation and its stockholders and therefore failed to act in good faith.").

[31] *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[32] D.I. 1 ¶ 97.

[33] *Id.* ¶ 98.

9

known duty to act."[34]  In substance, the trustee's argument is that the decision to open the trading window was made by the officers in exchange for the directors' decision to approve retention bonuses, in what amounts to a *quid pro quo* arrangement under which each fiduciary put his or her own interests ahead of those of Tricida.[35]

### A. The otherwise suspicious timing of the bonus payments, which were made on the same day that the officers opened the trading window, is undercut by the interceding SEC filing.

The trustee's principal argument suggesting a causal connection between the approval of the retention bonuses and the opening of the trading window relies on the closeness of time between the retention  bonuses and the decision to open the trading window.[36]  The trustee points to various prior occasions when the officers refused to open the trading window as support for the proposition that they only did so as a *quid pro quo* for receipt of the retention bonuses.[37]

The trustee states that the officers decided, before the November 15 board meeting, that the trading window would remain closed.[38]  The officers made this determination after being informed by outside counsel that the trading window should not be opened as long as the directors or officers continued to hold material nonpublic information.[39]  Outside counsel "provided no advice about whether the

---

[34] *Id.* ¶ 99.

[35] *See id.* ¶¶ 53-55.

[36] *Id.* ¶ 63.

[37] *Id.* ¶¶ 63-64.

[38] D.I. 1 ¶¶ 47-48.

[39] *Id.* ¶ 62.

directors or officers possessed such information."[40]  The trustee then states that at the November 21 board meeting, the officers opened the trading window, and on the same day, the retention payments hit the bank accounts of the officers.[41]  The trustee asserts from this timeline that "[t]he only logical conclusion is that the Officer Defendants' decision to reopen the trading window, and therefore their decision to allow OrbiMed to sell its shares, was influenced by Veitinger and Bonita's approval of the Bonus Payments."[42]

On a motion to dismiss, one is of course required to draw all reasonable inferences from the facts alleged in favor of the non-moving party.[43]  So if the factual story as told by the trustee were all there was to be told about the story, it would at least be arguable that one could infer, from the facts alleged in the complaint, that the decision to open the trading window was tied to the payment of the retention bonuses.

There is, however, more to the story.  In between the officers' November 15 determination that the window would remain closed and the November 21 decision to open the trading window, on November 17, Tricida filed an SEC Form 8-K, in which the company disclosed the fact of the retention bonuses and that it was considering strategic alternatives in light of the failure of the clinical trial.[44]  And while the Court

---

[40] *Id.*

[41] *Id.* ¶ 63.

[42] *Id.*

[43] *Bohus v. Restaurant.com, Inc.*, 784 F.3d 918, 921 n.1 (3d Cir. 2015).

[44] *See* D.I. 26-4.

11

cannot consider the 8-K for the *truth* of what is stated inside it, the parties do not dispute that the Court can take judicial notice of the *fact* that an 8-K disclosure was made on November 17.[45] The filing of an 8-K, a supplemental disclosure of material information to shareholders, provides a significant fact that undermines the plausibility of the trustee's suggestion of a *quid pro quo* – a suggestion that relied heavily on an otherwise unexplained decision to open to the trading window that coincided with the payment of the retention bonuses.

The intervening 8-K filing, however, could certainly make the inference the trustee seeks to draw far less plausible. Indeed, in light of the 8-K filing, the defendants' argument on the motion to dismiss looks a great deal like the argument made by defendants in *Twombly*.[46] There, the defendants, who were the regional bell operating companies created upon the breakup of American Telephone & Telegraph, engaged in "parallel conduct" by refraining from competing with one another. But the Supreme Court found that alleging parallel conduct without more was insufficient to make a plausible allegation of an antitrust conspiracy. "A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the

---

[45] *See Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999) ("[O]n a motion to dismiss, we may take judicial notice of another court's opinion – not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity."); *U.S. v. Wood*, 925 F. 2d 1580, 1582 (7th Cir. 1991) ("The district court may also take judicial notice of matters of public record."); Fed. R. Evid. 201 ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

[46] *Twombly*, 550 U.S. 544.

agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory."[47]

Precisely the same is true of a decision to open the trading window after the issuance of an 8-K.  To be sure, it is *possible* that even after the public disclosure, the company and its insiders were still in possession of material inside information, and the decision to open the trading window was actually influenced by the payment of retention bonuses.  But that is possible in the same way that it is possible that where there is parallel conduct it is because the parties reached a secret agreement to interfere with competition.  And as the Supreme Court said in *Twombly*, the fact that an inference can *possibly* be drawn in such a manner is insufficient to make it *plausible* based on the factual allegations.  The allegations in the complaint are thus insufficient to make a plausible allegation that the decision to open the trading window was the result of a *quid pro quo* in a manner that violated the directors' or officers' duties of loyalty.

Perhaps an argument could be made, in response, that in context, the substance of what was disclosed in the November 17 8-K filing was insignificant.  That is, one could perhaps argue that what was disclosed on November 17 was either already known, or sufficiently unrelated to the prior decisions to leave the trading window closed, that one could still draw a reasonable inference from the facts alleged in the complaint that the officers voted to open the trading window as part of a corrupt

---

[47] *Id.* at 557.

bargain.   The difficulty here, however, is that because the complaint makes no mention at all of the November 17 8-K filing, the trustee is hard pressed to engage that line of argument.   The Court accordingly concludes that the complaint, as pled, fails to assert a plausible claim under *Twombly*.   Whether an amended complaint that engages with the November 17 8-K filing could assert such a plausible claim is a matter that the Court would consider if and when it were presented with a motion for leave to amend.

**B.    The business judgment rule protects the directors' decision to approve the bonuses where the payments were customary.**

The trustee similarly contends that the directors violated their duties of loyalty in approving the retention bonuses.   Under Delaware law, such decisions are typically examined under the business judgment rule, which protects corporate directors in the performance of their duties by presuming that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[48]   Unless the plaintiff alleges facts plausibly rebutting one of the elements, the directors' "decisions will not be disturbed if they can be attributed to any rational business purpose."[49]   In this, the business judgment rule provides "something as close to non-review as our law contemplates."[50]

---

[48] *New Enterprise Associates 14, L.P. v. Rich*, 292 A.3d 112, 158-161 (Del. Ch. 2023) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

[49] *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971).

[50] *Kallick v. Sandridge Energy, Inc.*, 68 A.3d 242, 257 (Del. Ch. 2013).

14

To overcome the business judgment rule, a plaintiff must plausibly allege facts suggesting that the majority of the board was compromised by (1) interestedness, (2) bad faith, or (3) lack of independence.[51]  Because, on a motion to dismiss, the plaintiff's factual allegations must be taken as true, the question is whether the complaint plausibly alleges that the board did not contain a majority of sufficiently informed, disinterested, and independent individuals who acted in good faith.

To be disinterested, a director "can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally."[52]  To be sufficiently independent, a director must not be "sufficiently loyal to, beholden to, or otherwise influenced by an interested party [so as] to undermine the director's ability to judge the matter on its merits."[53]

Here, the parties agree that the voting board that approved the retention payments was composed of six members.[54]  The trustee thus must allege that three of the directors were either interested, lacked independence, or acted in bad faith. The trustee's bad faith argument rests on the *quid pro quo* argument addressed above in Part I.A and fails for the same reasons described there.

The trustee also alleges interestedness and lack of independence against Alpern, Bonita, and Veitinger, which the Court will address in turn.  There is no

---

[51] *See New Enterprise*, 292 A.3d at 160.

[52] *Id.* at 162.

[53] *Id.* at 160-161.

[54] D.I. 1 ¶ 54.

15

plausible allegation that Alpern lacked independence, as the trustee raises no interested party to whom he is alleged to have been loyal or beholden. The complaint alleges that Alpern was interested in the transaction and acted in bad faith as a result of his own interest in selling his Tricida stock.[55] These allegations, however, are insufficient to allege interestedness. *First*, the challenged transaction is the approval of the bonus, in which Alpern had no interest. There is no allegation that Alpern himself received a bonus. And *second*, more basically, to find interestedness based on Alpern's purported desire to sell shares, the trustee relies on the other half of the "exchange" in the alleged *quid pro quo*. As explained above, those allegations are inadequate. As a result, the trustee has failed plausibly to allege that Alpern was not a disinterested and informed director acting in good faith.

The complaint also alleges that Bonita and Veitinger were self-interested and lacked independence in making the decision to approve the retention payments due to their affiliation with OrbiMed.[56] The allegations of interestedness and bad faith fail for the same reasons as do the allegations against Alpern. The assertion that Bonita and Veitinger lacked independence due to their affiliations with OrbiMed raises closer questions. But the complaint would fail to state a claim even if those allegations were sufficient, because Bonita and Veitinger do not make up a majority of the board. Because the complaint fails to allege that a majority of the board was not disinterested, informed, and acting in good faith, the business judgment rule

---

[55] *See id.* ¶ 70.

[56] *Id.* ¶ 96.

applies to the decision to approve retention bonuses.  The claims against the directors for breach of the duty of loyalty will thus be dismissed.

> **C.    The trustee fails plausibly to allege that the officers' bonuses were in violation of the terms of any compensation policy or that the officers knew of any alleged violation of such a policy.**

An employee is not generally liable for compensation decisions they did not make or with which they did not improperly interfere.[57]  The trustee nevertheless puts forth two reasons why, it contends, the officers breached their duty of loyalty in accepting the payments.  The *first* is the officers' alleged participation in what it describes as the *quid pro quo*.  As explained above, the Court is not persuaded that the trustee plausibly alleges a *quid pro quo*, so this cannot support a breach of the duty of loyalty.  The s*econd* basis is the officers' alleged acceptance of retention payments they knew exceeded the limits set forth in the company's compensation policies.  This requires that (1) the payments did exceed a binding limit provided in the policies and (2) the officers knew that the payments exceed such a limit.  While the trustee does make allegations about the existence of a compensation policy, the Court need not decide whether the payments here potentially violated that policy, since the trustee makes no factual allegation that the officers had any knowledge of the policy.  The claims for breach of the duty of loyalty against the officers will thus be dismissed for failure to state a claim.

---

[57] *Walt Disney*, 907 A.2d at 757-758 (finding fiduciary did not breach duty of loyalty where he played no part in the decisions and did not improperly interject himself into nor manipulate the decision-making process).

**II.    The trustee's claim for breach of the duty of care against the officers will be dismissed because the trustee fails plausibly to allege that the officers had material nonpublic information after the company issued the November 17 8-K.**

In Delaware, the duty of care is "[p]redicated upon concepts of gross negligence" and a claim cannot succeed without such a showing.[58]   To establish negligence in this context, the plaintiff must demonstrate the defendant's "reckless indifference to" or "deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason."[59]   This requires a showing that the defendant acted in a way that was "recklessly uninformed" or "outside the bounds of reason."[60]   The fact that a decision may be unreasonable does not by itself establish that it was a reckless one.   Rather, the decision has to be so off the mark as to constitute a gross abuse of discretion.[61]   This may be shown in a pleading through plausible allegations that, for example, a major decision was made without conducting due diligence or without retaining experienced advisors.[62]

To allege plausibly that the officers' decision to open the trading window was a violation of their duty of care, the trustee must either (1) identify material nonpublic

---

[58] *United Food & Comm. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1049-1050 (Del. 2021); *In re Fedders North America, Inc.*, 405 B.R. 527, 539 (Bankr. D. Del. 2009) (citing *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1113 (Del. Ch. 2008)).

[59] *Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc.*, 251 A.3d 212, 287 (Del. Ch. 2021) (internal quotations and citations omitted).

[60] *In re Solutions Liquidation LLC*, 608 B.R. 384, 398 (Bankr. D. Del. 2019) (internal quotations and citations omitted).

[61] *Firefighters'*, 251 A.3d at 287.

[62] *See Trenwick America Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 194 (Del. Ch. 2006).

18

information that would have necessitated keeping the window closed such that opening it was a gross abuse of discretion or (2) plausibly allege that the decision was made by "recklessly uninformed" officers. To be material nonpublic information, the information must of course be *material*, which means that there is a "substantial likelihood" that a "shareholder would consider it important."[63]

The trustee acknowledges that the officers acted with the guidance of outside counsel in deciding under what conditions the window could be opened.[64] There accordingly is no allegation that the officers took action while recklessly uninformed. The complaint must therefore plausibly allege that the decision to open the window was a gross abuse of discretion. To do so, the trustee must allege that the company remained in possession of material nonpublic information even after the 8-K filing, such that the decision to open the trading window was outside the bounds of reason. The trustee identifies three specific pieces of information that he contends were material and nonpublic.[65]

*First*, the trustee asserts that Tricida's net operating losses were valuable and would be rendered worthless if a change of control occurred was material nonpublic information. But the tax laws regarding the effect of a change of control are of course a matter of public record. Tricida's financial distress and the fact that it was exploring strategic alternatives process had also been disclosed. The trustee

---

[63] *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 439 (1976).

[64] D.I. 1 ¶ 48.

[65] *Id.* ¶ 64.

accordingly fails to allege that the decision to open the trading window was grossly negligent on this basis.

*Second*, the trustee argues that OrbiMed's ownership percentage and its desire to sell its shares was material nonpublic information. It cannot be said that a reasonable investor would consider OrbiMed's interest in the opening of the trading window to be material. The financial distress and failure of Tricida's business had already been disclosed. In the absence of an allegation that a shareholder itself has material inside information, the trustee points to no authority suggesting that the fact that any given shareholder might be interested in either buying or selling is itself material inside information. The trustee therefore does not allege that the officers acted outside the bounds of reason in opening the trading window on account of this information.

*Third*, the trustee contends that the officers and directors had "nonpublic details of its discussions with potential strategic partners."[66] The trustee does not allege that any of this information was material, nor does it allege specific facts about the discussions that any officer or director knew. The failure to identify any specific fact, or even to acknowledge that the company had issued an 8-K in which it disclosed the most important fact (that it was exploring strategic alternatives) makes it impossible to find that any particular undisclosed fact was material.

Taken together, the trustee fails to make plausible allegations of fact sufficient to show that that the company retained material nonpublic information after it issued

---

[66] D.I. 1 ¶ 64.

the 8-K such that opening the trading window was a gross abuse of discretion.  The claims for breach of the duty of care against the officers will thus be dismissed.

### III.   The trustee's *Brophy* claims against Bonita and Alpern fail because the trustee does not plausibly allege that either had material nonpublic information.

The Delaware Court of Chancery held in *Brophy v. City Service Co.* that a corporate insider who trades on confidential information violates the insider's fiduciary duty to the corporation even if the corporation did not itself suffer direct injury from the trading.  To state such a claim, a plaintiff must allege (1) the possession by a fiduciary of material nonpublic information, and (2) the fiduciary's improper use of that information through trades motivated in whole or in part by that inside information.[67]  Materiality under a *Brophy* claim requires a court to "evaluate the information in [the fiduciary's] possession, compare it to what the market knew, and identify if any of the non-disclosed information would have been of consequence to a rational investor, in light of the total mix of public information."[68]  Here, the trustee alleges four pieces of material nonpublic information that Bonita or Alpern allegedly possessed at the time when they are alleged to have sold their shares.[69]

*First*, the trustee asserts that Bonita and Alpern had material nonpublic information about the value of the company's net operating losses and the effect a change of control event could have with respect to that value.  As described above, however, both were matters of public record.  The trustee does not identify any

---

[67] *In re Am. Int'l Grp.*, 965 A.2d 763, 800 (Del. Ch. 2009).

[68] *In re Oracle Corp.*, 867 A.2d 904, 940 (Del. Ch. 2004).

[69] D.I. 1 ¶¶ 64, 66.

21

information that Bonita or Alpern allegedly possessed beyond what was publicly available.

*Second*, the trustee alleges that Bonita's knowledge of OrbiMed's desire to sell was material nonpublic information. As described above, however, in the absence of a suggestion that OrbiMed itself held material inside information, the trustee identifies no authority suggesting that OrbiMed's desire to sell its shares would be material.

*Third*, the trustee suggests that the company's decision to open the trading window was material nonpublic information. But that argument must fail as a matter of ordinary logic. A company can open a trading window only when it concludes that it does not hold material nonpublic information. And if the decision to open the trading window were itself material nonpublic information, then no trading window could *ever* be opened. In a nod to this reality, the trustee says that the opening of the trading window is not *itself* material nonpublic information, but becomes such information in view of the net operating losses and OrbiMed's interest in selling its shares.[70] But because neither of those other bits of information amounts to material nonpublic information on its own, the combination of those items fares no differently.

*Fourth*, the trustee argues that the company's knowledge of strategic alternatives was material nonpublic information. The fact that the company was exploring such alternatives, however, was publicly disclosed. And the trustee

---

[70] *Id.* ¶ 66.

identifies no specific information about those alternatives that Bonita or Alpern allegedly possessed beyond what had been publicly disclosed.  The failure to identify any such specific information is fatal to the trustee's claim.  The Court will therefore dismiss the *Brophy* claims.

## IV.    The trustee's claims for waste and unjust enrichment fail to meet the high standard governing such claims and will thus be dismissed.

Under Delaware law, "a claim of waste will arise only in the rare, unconscionable case where directors irrationally squander or give away corporate assets."[71]  To state a claim for corporate waste, a plaintiff must plead facts showing an exchange so one-sided that no reasonable businessperson of ordinary sound judgment could conclude the corporation received adequate consideration.[72]  If the corporation receives any beneficial consideration, and if there is a good faith judgment that the exchange is worthwhile under the circumstances, there should be no finding of waste, even if a court concludes, after the fact, that the exchange was unreasonably risky.[73]

The trustee states that retention payments were approved by the board after it had determined that the debtor should be sold or restructured.[74]  The trustee

---

[71] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 74 (Del. 2006) (internal quotation and citations omitted).

[72] *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 576 (Bankr. D. Del. 2008).

[73] *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) ("If, however, there is *any substantial* consideration received by the corporation, and if there is a *good faith judgment* that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude *ex post* that the transaction was unreasonably risky." (quoting *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997))).

[74] D.I. 1 ¶ 55.

further acknowledges that it is "not unprecedented" for companies in the debtor's position to provide such payments to retain key employees during a sale or restructuring.[75] The trustee, however, contends that that rationale should not apply here, a circumstance in which the debtor's drug trial had failed, the debtor determined to pursue a sale or restructuring, and none of the officers had indicated an intention to leave.[76]

These allegations are insufficient to clear the high bar necessary to state a claim for waste. The trustee acknowledges that the retention payments were made in exchange for the officers' continued service during the sale and restructuring process.[77] That acknowledgment effectively defeats a corporate waste claim.

The unjust enrichment claim likewise fails. Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[78] The complaint alleges that the officers were unjustly enriched by the same retention payments but does not plausibly allege that the officers wrongfully obtained the payments, acted inequitably in receiving them, or retained funds under circumstances that offend principles of equity and good conscience. The complaint alleges that the payments were made pursuant to the board's retention plan in

---

[75] *Id.*

[76] *Id.*

[77] *Id.* ¶¶ 55, 56.

[78] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (citing *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)).

exchange for the officers' continued services during the debtor's sale and restructuring process, which the trustee acknowledges is typical in circumstances of financial distress.[79]  Without more, those allegations do not plausibly state a claim for unjust enrichment.

**V.    The trustee's claim against OrbiMed for aiding and abetting will be dismissed where the trustee has failed plausibly to allege an underlying breach.**

A party may be liable for aiding and abetting a breach of fiduciary duty where the party "knowingly participates" in the underlying breach.[80]  A complaint must plausibly allege the four elements of an aiding and abetting claim to survive a motion to dismiss, including an underlying breach and knowing participation in that breach.[81]  An aiding and abetting claim cannot survive if the plaintiff fails plausibly to allege an underlying breach of fiduciary duty by the primary actor.  Without such a plausibly alleged breach, the claim against the alleged aider and abettor must be dismissed.[82]

The trustee's aiding and abetting claim is premised on the allegation that OrbiMed encouraged the company to open the trading window, which it is argued was a breach of the fiduciary duties of both the officers and the directors.[83]  As explained

---

[79] D.I. 1 ¶ 55.

[80] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (citations omitted).

[81] *Id.* at 1096 ("(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, ... (3) knowing participation in that breach by the defendants," and (4) damages proximately caused by the breach." (quoting *Penn Mart Realty Co. v. Becker*, 298 A.2d 349, 351 (Del. Ch. 1972))).

[82] *City of Fort Myers Gen. Emps. Pension Fund v. Haley*, 235 A.3d 702 (2020).

[83] D.I. 1 ¶ 126.

above, however, the trustee fails to make plausible allegations of an underlying breach.  The aiding and abetting claim therefore fails as a matter of law and will be dismissed.

## Conclusion

For the foregoing reasons, the motion to dismiss will be granted without prejudice to the trustee's right to seek leave to amend (and the defendants' right to oppose a motion for leave) within 30 days of the issuance of the order dismissing the complaint.

Dated: June 30, 2026

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE